```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

WARREN J. APOLLON, D.M.D.,                    CIVIL ACTION
P.C., ET AL.

VERSUS                                        NO: 06-2940

OCA, INC., ET AL.                             SECTION: R(3)
```

### ORDER AND REASONS

Before the Court is plaintiffs' Motion for Summary Judgment. For the following reasons, the Court GRANTS the motion.

I.  **Background**

   A.  **Factual Background**

This matter arises out of business relationship between a private orthodontic practice, Warren J. Apollon, D.M.D., P.C. (Apollon), and its provider of business, financial, and office management services, Orthodontic Centers of America, Inc. (OCA). OCA operates through a network of wholly owned subsidiaries named according to the states in which OCA does business (*e.g.*,

Orthodontic Centers of Pennsylvania, Inc.). Through its subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support, among other services. Under the BSAs, the doctors pay OCA a monthly fee based upon a percentage of their operating profit or practice revenue. The BSAs are OCA's primary asset and the source of nearly all of its revenue.

**B.   Business Service Agreement**

In 2000, Dr. Warren Apollon, an orthodontist with offices in Pennsylvania, entered into a BSA with OCA. (R. Doc. 41-4). OCA agreed to provide a range of business and administrative services under the BSA in exchange for what is designated in the BSA as a "service fee." Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice medicine free of administrative hassles. OCA was responsible for (i) employment, scheduling and training of office staff; (ii) provision and maintenance of offices, telephones, and utilities; (iii) provision and maintenance of furniture, fixtures, and equipment; (iv) bookkeeping and accounting services; (v) billing and collections services; (vi) administration of the practice's bank account and disbursement of funds therefrom; (vii) installation of computer hardware and software, and training

2

staff on the utilization thereof; (viii) ordering and management of supplies and inventory; (ix) assistance in recruiting associate orthodontists; (x) preparation of statistical data and analyses of the practice's operations; (xi) legal services for the practice's routine operations; (xii) various consulting advice; (xiii) marketing and advertising services; (xiv) negotiation of managed care contracts; and (xv) all other business and administrative services reasonably required. (BSA at ¶¶1.1 and 1.10).

The BSA explicitly states that "OCA is not authorized or qualified to engage in any activity that may be deemed or construed to constitute 'the practice of dentistry' under the applicable laws and regulations of the Commonwealth of Pennsylvania." (BSA at ¶1.2). Still, OCA held exclusive control over Apollon's orthodontic revenues and controlled the disbursement of funds from the practice's bank account. (BSA at ¶¶1.7-1.8). In addition, although the agreement said that the office equipment and furnishings were to be under the "exclusive control" of Apollon, OCA owned Apollon's office equipment and furnishings and leased these items to Apollon. (BSA at ¶1.4). Further, although Apollon had to consent, OCA had Apollon's power of attorney to negotiate managed care plans with preferred provider organizations and health maintenance organizations,

which governed the amounts that Apollon would be reimbursed for dental services by the insurers if he participated in such a plan. (BSA at ¶1.10).

In the BSA, both parties agreed to covenants not to compete. (BSA at ¶¶ 5.1-5.2). Specifically, OCA agreed not to affiliate with more orthodontic practices within the designated market area than the total number of Toys 'R Us or Home Depot stores within the designated market area. (BSA at ¶5.1). Apollon agreed that he would not be involved with any other orthodontic practice, solicit patients to patronize any other orthodontic practice, or be involved in any enterprise that provides management services to orthodontic practices during the term of the agreement. (BSA at ¶5.2(b)). Apollon also agreed that he would not solicit any patients of the practice to patronize another practice not affiliated with OCA, be involved in a practice operating within the designated market area or within two miles of the practice, or be involved in the provision of business services to an orthodontic practice for a period of two years after the BSA expired or was terminated. (BSA at ¶5.2(c)). The BSA was to last for a term of 25 years. (BSA at ¶4.1). The BSA also contained a choice of law provision which stated that the laws of Pennsylvania shall govern the validity and interpretation of the agreement. (BSA at ¶8.5).

4

### C. Service fee arrangement

Under the BSA, Dr. Apollon agreed to pay OCA in accordance with a formula. For the first three years, the fee for the Langhorne office was to be the following amount:

(1) patient revenue, less

(2) the sum of (A) the Initial Minimum Orthodontist

Amount and (B) any Additional Orthodontist Amounts.
(BSA, Exhibit B). For the King of Prussia office, the fee was to equal patient revenue minus 60% of the net operating margin for that office. (BSA, Exhibit B). After three years, the service fee for both offices would be patient revenue minus 60% of the net operating margin. (BSA, Exhibit B). This arrangement will be discussed in more detail, *infra*.

### D. Procedural Background

On March 14, 2006, OCA and its subsidiaries filed for bankruptcy. On May 23, 2006, the plaintiffs sued OCA seeking declaratory relief and damages for breach of contract and breach of fiduciary duty. (R. Doc. 1-2). OCA counterclaimed, seeking declaratory relief that the contract was valid and specific performance. (No. 06-1132 (B), R. Doc. 31). On November 5, 2007, the Court issued an Order withdrawing the reference to the Bankruptcy Court. (R. Doc. 36). Apollon now moves for summary judgment on the issue of whether the BSA is invalid and

5

unenforceable under Pennsylvania law. (R. Doc. 41).

**II.   Legal Standard**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *Lavespere,* 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue

6

exists. *See Celotex,* 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

**III. Discussion**

    **A.    The invalidity of the BSA under Pennsylvania's Professional Corporation statute**

Neither party disputes that a partnership between Apollon and OCA would be illegal. Under Pennsylvania law, professional corporations may be organized for the purpose of rendering professional services. 15 Pa. Cons. Stat. Ann. § 2903. Except as otherwise provided by statute, only licensed persons shall own shares in a professional corporation. 15 Pa. Cons. Stat. Ann. § 2923(a). Accordingly, only licensed dentists may own a share in a dental partnership. It is undisputed that OCA is not a licensed dentist. Therefore, if OCA and Apollon are partners, as Apollon contends, their business arrangement violates section 2923.

Pennsylvania law provides that a partnership is "an association of two or more persons to carry on as co-owners a business for profit." 15 Pa. Cons. Stat. Ann. § 8311. A

7

partnership exists if there is a "clear, mutual assent on the part of two or more persons to form a partnership." *Leprino Foods Co. v. Gress Poultry, Inc.*, 379 F. Supp. 2d 650, 655 (M.D. Pa. 2005). A partnership may be implied from all attending facts and circumstances (*i.e.*, the manner in which the alleged partners conducted the business). *See id.; Murphy v. Burke*, 311 A.2d 904, 907 (Pa. 1972); *Gohen v. Gravelle*, 192 A.2d 414, 416 (Pa. 1963). The sharing of gross returns does not of itself establish a partnership. 15 Pa. Cons. Stat. Ann. §8312. But sharing profits is prima facie evidence of a partnership, unless the profits were received in payment:

    (i) As a debt by installments or otherwise.

    (ii) As wages of an employee or rent to a landlord.

    (iii) As an annuity to a surviving spouse or representative of a deceased partner.

    (iv) As interest on a loan though the amount of payment varies with the profits of the business.

    (v) As the consideration for the sale of the goodwill of a business or other property by installments or otherwise.

15 Pa. Cons. Stat. Ann. § 8312(4); *see also Leprino Foods*, 379 F. Supp. 2d at 655 ("[a]n established pattern of profit and loss sharing may support a finding of partnership."). The burden of

proof lies with the party seeking to prove the partnership. *Leprino Foods*, 279 F. Supp. 2d at 655 (citing *In re Jackson*, 28 B.R. 559, 563 (Bankr. E.D. Pa. 1983)).

The Court finds that the BSA creates an illegal partnership between OCA and Apollon. Although OCA asserts otherwise, OCA and Dr. Apollon were sharing profits. After the first three years, OCA's Standard Service Fee was equal to the following amount:

(i) Patient Revenue; less

(ii) 60% of the Net Operating Margin.

(BSA, Exhibit B at ¶2). The Net Operating Margin means "the total amount of cash and cash equivalents collected in respect of orthodontic goods and services by or on behalf of the Orthodontist during the applicable period, less the Center Expenses for the applicable period." (BSA, Exhibit C). Thus the Net Operating Margin is essentially Patient Revenues minus Center Expenses. Center Expenses are all of the expenses OCA incurred in its provision of services to the orthodontist. (BSA, Exhibit D). OCA's reimbursement for Center Expenses is provided for in the calculation of the Standard Service Fee. (BSA at ¶3.1(b)). The orthodontist's net revenues were to be 60% of the Net Operating Margin. (BSA at ¶3.2(a)).

The agreement was designed to generate payments to OCA in

9

excess of the costs it expended on the business ("Center Expenses"), otherwise it would make little business sense. In actuality, the fee OCA received under the formula was equal to 40% of the profits, plus its reimbursement for Center Expenses. This can be demonstrated as follows. The amount OCA received in excess of costs can be called OCA's net fee. In the illustration, OCA's net fee is represented as x, Center Expenses as y, and Patient Revenue as z. Since the Service Fee was equal to Patient Revenue minus 60% of the Net Operating Margin, and the Net Operating Margin was equal to Patient Revenue minus Center Expenses, the Service Fee can be described as: z - 0.6(z - y). The Service Fee included OCA's net fee plus its reimbursement for Center Expenses, and thus can also be described as: x + y. This financial arrangement is represented by x + y = z - 0.6(z - y). OCA's net fee (x) can be calculated with some simple algebra:

$$x + y = z - 0.6(z - y)$$

$$x + y = z - 0.6z + 0.6y$$

$$x + y = 0.4z + 0.6y$$

$$x = 0.4z + 0.6y - y$$

$$x = 0.4z - 0.4y$$

$$x = 0.4(z - y)$$

Therefore OCA's net fee is equal to 40% of Patient Revenues minus

10

Center Expenses, which means 40% of the Net Operating Margin. Thus OCA was receiving a 40% share of the practice's profits.

Profit-sharing is prima facie evidence of partnership, *see* 15 Pa. Cons. Stat. Ann. § 8312(4). Since plaintiff has established prima facie evidence of partnership, the burden of proof shifts to OCA to show that the arrangement was not a partnership. *See Demarchis v. D'Amico*, 637 A.2d 1029, (Pa. Super. Ct. 1994).

OCA has failed to rebut the prima facie evidence of partnership. To rebut plaintiffs' contention, OCA relies on the provision in the BSA labeling the parties independent contractors. (BSA at ¶5.7). OCA cites two older Pennsylvania Supreme Court cases holding that if the parties agree that the legal status of their relationship is not a partnership, the agreement will be given effect. *See Kingsley Clothing Mfg. Co. v. Jacobs*, 26 A.2d 315, 317 (Pa. 1942); *Kirshon v. Friedman*, 36 A.2d 647, 650 (Pa. 1944). In *Kingsley*, the agreement at issue provided that the parties did not intend to form a partnership relationship. But, as the Second Circuit noted, the other terms of the contract did not evince an intent to form a partnership. *See In re PCH Assocs.*, 804 F.2d 193, 198 (2d Cir. 1986) (finding that the terms of the contract in *Kingsley* were "not otherwise ambiguous"). For instance, in *Kingsley*, plaintiff and defendant

11

entered into a contract under which plaintiff was to lease its coat manufacturing plant to defendants for the manufacture of 20,000 coats that defendants had contracted to make for the government. 26 A.2d at 316.  In exchange for the use of its plant for this limited project, plaintiff was to receive one-half of the profit from the project. *Id.*  The agreement was essentially a single transaction and did not establish a continuing relationship between the parties. *Id.*  The only provision suggesting a partnership was the provision for profit sharing.  Similarly in *Kirshon*, the Court's only evidence of an intent to form a partnership was a provision entitling plaintiff to 25% of the company's profits.  The other evidence showed that he was an employee, rather than a partner. 36 A.2d 651.

In contrast, here, despite the BSA's disclaimer that the parties are independent contractors, the other provisions of the agreement show an intent to form a partnership.  OCA's ability to control and manage the business for a term of 25 years shows that OCA had an investment in the practice beyond that of an independent contractor.  Along with profit-sharing, co-ownership of a business is an indispensable requirement of a partnership.  *Commonwealth by Zimmerman v. Sklenar*, 486 A.2d 1019, 1020 (Pa. Commw. Ct. 1985) (citing *Provident Trust Co. of Philadelphia v. Rankin*, 5 A.2d 214 (1939)).  Joint control of business decisions

is a significant element in determining whether co-ownership exists. *See* J. William Callison and Maureen A. Sullivan, Partnership Law & Practice § 5.13 (2008). Here, OCA has extensive control in managing the practice's business. OCA controlled the practice's finances (BSA at ¶¶1.7-1.8) and negotiated contracts on its behalf. (BSA at ¶1.10). OCA had numerous other managerial responsibilities under the BSA. OCA was responsible for employing and training office staff, and it "assisted" in recruiting associate orthodontists for the practice. (BSA at ¶¶1.1 and 5.6). OCA was also responsible for providing and maintaining office space, marketing and advertising, and administering the practice's payroll. (BSA at ¶1.1). OCA handled all bookkeeping tasks for the practice and handled all billing and collections. (BSA at ¶¶1.7-1.9). It maintained the insurance for the Center premises and equipment (BSA at ¶6.2) and had the power to negotiate managed care contracts with health maintenance organizations on behalf of the practice. (BSA at ¶1.10). OCA leased the practice's office space and provided the furniture and equipment for the office. (BSA at ¶¶1.4-1.5). OCA required the practice to be open at least 150 hours per month. (BSA at ¶2.5). OCA also restricted the orthodontist's ability to practice outside of the agreement for the BSA's 25-year term and two years after the BSA ended. This

13

non-compete provision demonstrates that OCA wanted to protect its economic interest in the joint enterprise, because a competing dental practice could endanger OCA's profits.

In reviewing a similar agreement the Fifth Circuit characterized it as follows:

> [T]he BSAs create an interlocking set of obligations that required OCA to exercise considerable control over the Orthodontists' practices. For instance, OCA conducted the financial and marketing activity of the practices, and it maintained the facilities, equipment, and support personnel required to operate the practices. The BSAs also stipulated how much each Orthodontist was required to work, and greatly restricted their ability to perform services outside of the BSAs. In exchange for these services, OCA charged a fee that was tied to the profits of the practices. The BSAs provide little to no ability for the Orthodontists to oversee any of OCA's decisions related to the practice. Ultimately, the Orthodontists were essentially only left with control over diagnosing and treating their patients.

*In re OCA, Inc.*, --- F.3d ---, 2008 WL 5192077 at *7 (5th Cir. 2008). The Fifth Circuit had little difficulty concluding that the BSA violated a Texas statute prohibiting unlicensed persons from owning, operating, or maintaining a dental practice. *Id.* Similarly here, OCA effectively operated and controlled the business aspects of the practice. OCA's degree of control over the practice and share in its profits evidence a partnership relationship.

Further, both cases cited by OCA stand for the principle that "[w]hether the parties are in fact partners *inter sese* is a matter of intention." *Ruth v. Crane*, 392 F. Supp. 724, 734 (E.D. Pa. 1975). But, as the Second Circuit has noted:

> While the parties to a contract may intend that, between themselves, their relationship is to be governed by the label they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement.

*In re PCH Assocs.*, 804 F.2d at 198 (construing Pennsylvania law). Although the parties may not consider their relationship a partnership, their understanding of the relationship *inter sese* does not change the legal consequences that flow from their agreement. The parties may not evade the dictates of the Pennsylvania professional corporation statute by labeling themselves as independent contractors rather than partners. Since the BSA effectively creates a partnership between a licensed orthodontist and an unlicensed corporate entity, the agreement violates section 2923(a).

### B. Severability and Enforceability

The illegality of these contract provisions cannot be severed from the other provisions of the BSA. Under Pennsylvania law, courts look to the intention of the parties to determine if a contract is severable. *Jacobs v. CNG Transmission Corp.*, 772

15

A.2d 445, 452 (Pa. 2001). The intent may be determined by express language in the contract or from construction of the agreement, including the nature of the consideration. *Id.* The character of the consideration may determine the severability of the contract. *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 775 (W.D. Pa. 2004) (citing *Heilwood Fuel Co. v. Manor Real Estate Co.*, 175 A.2d 880, 884 (Pa. 1961)). It has been held that if consideration cannot be apportioned, the contract is not severable as a matter of law. *Id.* (citing *Canister Co. v. Wood & Selick*, 73 F.2d 312, 313 (3d. Cir. 1934)).

Here, the BSA contains a clause providing that if a provision of the agreement is held to be illegal, then it shall be severed from the agreement, leaving the remainder effective and binding upon the parties. (*See* BSA at ¶8.8). But one of the provisions at issue here is the service fee arrangement — the entire consideration for OCA's management services under the contract. Further, OCA has failed to identify any provision of the BSA that could be severed in order to reform the agreement. *See In re OCA,* --- F.3d ---, 2008 WL 5192077 at *7 (finding that a severability clause did not save an OCA contract under Texas law since OCA failed to identify which provision of the BSA could be severed). Accordingly, the BSA cannot be reformed.

Under Pennsylvania law, "an agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void." *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 588 A.2d 491, 495 (Pa. 1991) (quoting *Dippel v. Brunozzi*, 74 A.2d 112, 114-15 (1950)). "The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them." *Id.* Here, OCA brought claims for declaratory relief that the contract was valid and specific performance. (No. 06-1132 (B), R. Doc. 31)). Apollon brought claims for breach of contract and breach of fiduciary duty are also unenforceable. All of these claims are premised on the parties' illegal relationship created under the BSA and are thus unenforceable. Accordingly, the Court will leave the parties where it found them.

IV. **Conclusion**

For the foregoing reasons, the Court GRANTS plaintiffs' Motion for Summary Judgment.

New Orleans, Louisiana, this **30th** day of December, 2008

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

17